This circuit for this case. I think you all are seasoned counsel and know about the red light system and all of that. Please recall that rebuttal is for rebuttal only and we will just get right to it. We'll call the case of Rhoades v. Davis, 16-70021, and begin with Mr. Dow. Thank you, Judge Haynes. May it please the court, I would like to address today the three issues that the court granted COA on, or three or four, depending on whether the procedural default issue with respect to the furlough is distinct from the furlough issue, in reverse order. And they're presented in the brief just because I want to spend the greatest amount of time on the furlough issue unless the court directs me otherwise. So I'll start with the Batson issue that the court granted a COA with respect to. The record is not as developed as one might hope because the case languished for many years and so some of the demographic information concerning members of the veneer and also even including the 12th member of the panel that ultimately sat is not part of the record. However, what is clear is that the district attorney exercised two peremptory challenges against two black panelists and that the jury that sat in judgment of Mr. Rhoades had no black jurors on it. What is also clear is that the reasons that the prosecutor gave in response to a properly lodged and preserved Batson objection with respect to the use of the peremptory challenges against Bernice Holliday and George Randall were pretextual. And finally, what is clear, neither the State court nor the court below engaged in the comparative questioning analysis. And let me ask you about that. Even if we assume arguendo, and I'm not conceding this point at all, but even if we assume arguendo that a comparative analysis is required, you still would have to show, wouldn't you, that the comparative analysis would have yielded something. You can't just say, well, they didn't do a comparative analysis, and it turns out there's no other juror like this one. It's not structural error that requires reversal just because. You would agree with that. I do agree with that, Judge Hayes. Okay. So where in your brief do you make the showing of what you're saying is so obvious, that there's all these other jurors that were kept who have the same record as Holliday and Randall? The habeas application that was filed in the court below contains that information. It points out that the prosecutor asked both of the black jurors about. . . Yeah, but your briefing to us, your brief to us has to show that there's something for us to send back to the district court. And your brief just says district court didn't do it. You should send it back. Is that good enough? I think that the record is clear, Judge Hayes, in view of what we filed in the court below. This court can certainly take cognizance of what's filed in the court below where we point out what the comparative questioning would have revealed. In this court, because the court below did not address the issue that was presented in the habeas application with respect to the disparate questioning, we do, in fact, ask this court simply to take notice of the fact that we argued in the court below that disparate questioning occurred and that in deciding that the prosecutor's use of peremptory challenges was race neutral. Okay. Let me ask you this. Is there another juror who lied about knowing whether what the reason their brother is in prison or their relative is in prison for? I know there were other jurors who had relatives in prison. But was there any other juror who lied about knowing the details of their relative in prison? I don't think that the record establishes outside of the State's assertion that the juror lied about not knowing the reason for the family member. Okay. Assuming, arguendo, though, that the judge made a credibility finding and the lawyer argued and the judge made a credibility finding that Juror Randall was lying, is there any other juror that we have a similar situation who said, yes, I have a relative in jail, I just visited them, and I have no idea what they're in jail for, prison for? The answer to that is that the prosecutor didn't ask any of the other jurors the question that would allow us to know the answer to that question. Is it possible that another juror would have lied in answer to a prosecutor's question? Yes, it's possible. Did that happen? No, that didn't happen. But one possible explanation for why that didn't happen is that the prosecutor didn't ask the white jurors that same question. So I think that we present at least three different fields where the prosecutors asked questions of these potential black jurors that they either didn't ask to other jurors, that is, the white jurors, or they did ask, but they were not troubled by the answers. And those — And on holiday, is there anyone else that was sleeping that was kept on the jury? Again, Judge Haynes, the question of whether other members who were ultimately seated were — had their eyes closed, because, of course, Ms. Holiday says she wasn't sleeping. The lawyers, when they made the Batson Challenge, said that the demeanor of hers that was identified by the prosecutor as indicating that she was asleep was also true of other — of other panels. But the judge said there was just a few, and he specifically — or she, I don't remember what the gender of the trial judge was. But the judge specifically found that Holiday was sleeping. Was there anyone else like that that was kept on the jury? The trial judge did not address whether any of the other members of the jury panel that the defense lawyers said exhibited the same demeanor were, in fact, asleep or were awake. But, you know, it's your burden here and in the district court and, frankly, on habeas in general, and you're basically saying the absence of evidence proves my case. And that's kind of disturbing to me. I don't think I'm saying that, Judge Haynes. What I think we're saying is that neither the State court nor the court below conducted this type of comparative analysis. If the State habeas court had said, I need you all to put on evidence that the way that the prosecutor questioned these white jurors who exhibited the same characteristics was different from the way the prosecutor was questioning the black jurors, then we would have that record. But the — What is your trigger for the conducting of a comparative analysis? You say it's to ask different questions. I think that once we make out the prima facie case, I think that once we make out the prima facie case, it triggers the Batson analysis. The prosecutor comes forward with race-neutral explanation. And in assessing the credibility of that race-neutral explanation or whether, in fact, it's pretextual, Judge Higginbotham, what the Supreme Court instructs in Millerell is that we have to conduct a comparative analysis. And neither the State court nor the court below — Regardless, what you were saying, if you're asking different questions in the ronari from one to the other, black to white, and that seems to be — you describe that as some kind of an independent of operative force than simply the announced of a preemptory challenge of a black member, a challenge to that, a requirement that you articulate the neutral reasons, and then they give the neutral reasons. And then at that point, you say, well, are you going to require that you — you're simply saying that asking, at that point, different questions of that person than they've asked of others, that that is one of the considerations? Is that just an evidentiary point? Yes, it's an evidentiary point. Period. It's not a — in and of itself, it's not a trigger. In other words, I got the sense that what would happen with Batson, you go through the normal process, and the prosecutor articulates reasons. Now, the question is, are those legitimate reasons or not that the trial court's got to decide? Now, relevant to that is whether the questions are targeted at race. And differential questions don't necessarily have anything pointing that direction at all. It depends on what the questions are. I don't disagree with that. Okay. All that I'm saying is that when the prosecutor says the reason that we got rid of Ms. Holliday, for example — But then what does the record show that these different questions were? The record is not developed because neither the state court nor the court below performed that analysis. What do you mean by performed the analysis? Performed the analysis of saying, well, yes, the prosecutor asked Ms. Holliday — I understand the construct, but what's the factual inquiry that you're making? The judge has got to go back and say, we impounded this jury, and you've got 40 people or more in the penitentiary, and they've got to go back and go to each one of those jurors. The state spends five minutes with one, five minutes with another, or more. That's for a very short period. We don't do these for days. So you're going to have differentials of questions. Look at the context I'm driving at. What I'm driving at is that in reality, we know that — you know and I know. You've been in the trial court. I've spent much of my life in it. But an awful lot of those questions are not calculated to elicit information. They're calculated to impart information. So that I've asked my first imparting question, and I don't need to ask it again. So, in other words, these become highly contextual, not simply the circumstance that you — and that means that this all leads to the conclusion that what do we do when we don't have the record? I think that we have enough of a record for the court below to have been able to have addressed the question of whether the prosecutor's explanation is pretextual by conducting the type of analysis that the Supreme Court requires in Millerell, and it was not conducted in Millerell. It was not in your brief. And the problem I have is, to some extent, when you're talking about a person who's either going to spend their life in prison or be executed, delay is in favor of your client. So it benefits your client if we vacate and send it back, and then you have some more time going in front of the trial court and so on and so forth, because delay, delay. I mean, this defendant has been — and I'm not blaming you personally. Obviously, you're new to the case, and it looks like some courts have been kind of slow here, but for quite some time. And so your argument seems to be let's further delay it by sending it to the district court. And we get a lot of cases where lawyers say the district court didn't do something they were supposed to do, and we still require that it mattered. And if it didn't matter, we don't send it back. If it matters, yeah, a lot of times we'll send it back because we should be a court of review and this kind of stuff, but not just everything the district court didn't do that they should have done, we send a case back for. And you still are — I'm still having trouble seeing what the district court can and should do that we can't and shouldn't do ourselves that you didn't brief. Let me just say two quick words, Judge Haynes. The first is that the state habeas application in this case was filed in 1997. The state court — the state court, the state habeas court denied relief in 2014. Seventeen years this case sat in state court awaiting resolution in state habeas. I'm fully aware of the point that you're making. I don't remember. Where was that in Texas? I'm sorry? Where was that pending in Texas? In Harris County. Harris County. And I'm not blaming you or your client for delay. I understand. I'm just saying we have had sufficient delay. And if I were you and I was representing your client, I too would be seeking more delay because, again, then he lives. And I completely understand that that is a different metric than somebody who's sitting in prison thinking they might get out and you're rushing and trying to get the person out. That's a whole different thing. And I'm not faulting you for that. I'm simply saying we have to have a reason to send something back. And unless you have something additional to add, I think you ought to move to your next point, unless my colleagues have questions, because I think you and I have exchanged this enough, but I want to be sure I've heard everything you have on this. Well, I guess I've got a couple. So when you say comparative analysis that should have been done, for example, if one of the reasons given for excluding a juror is that the juror had a relative in jail, but then there were whites who had relatives in jail and they weren't excluded, is that at least a component of a comparative analysis? Yes, that's a component of a comparative analysis. And isn't that one of the reasons that was given here for excluding one of these jurors? Yes, Judge Graves, that is one of the reasons it was given here. All right. And when you talk about disparate questioning, because that generated a lot of questions, and, frankly, I'm confused, too, by your use of that term, are you saying that the prosecutor asked more questions of African-American jurors than white jurors, or are you saying that he asked different kinds of questions of African-American jurors than he put to white jurors who were similarly situated? The latter. The latter? The latter. All right. He asked different kinds of questions. They didn't ask the white jurors about their church membership. They didn't ask white jurors about what other members of their family think about the death penalty. They asked some. They asked some. You're correct. They didn't ask all. You're correct, Judge Hayes. And I just want to be clear on Randall. It's not just that he had a relative in prison. It's that he lied about knowing what the relative in prison was there for. That's a little bit more specific. And we don't have any other, whether we should or shouldn't, a record, this and that, we don't have any other juror who was kept who said, I visited my relative in prison, but I don't know what they're there for. Do we? Do we have someone like that? We don't, Judge Hayes. Okay. But we don't have any proof that he lied about it, do we? We do not, Judge Graves. And that's why, Judge Hayes, in my experience in developing the comparative analysis of determining whether the prosecutor's presumably race-neutral explanations are pretextual, the prosecutor is a witness in that proceeding. And there is a defense lawyer who says to the prosecutor, you asked this juror this question, and you're saying this is the reason that you got rid of her, but you asked this juror, who was white, the exact same question, got the exact same answer. Why didn't you get rid of him? And that did not happen in this case, and that's what was supposed to happen under Millerell. Okay. But if this is a matter of believing someone, so you have a juror who says, I don't know why my brother's in prison even though I visited him. You have a judge there to make credibility findings. The judge discounted some other point that they raised. I don't remember what it was. It was some other thing about child support. The judge discounted that but didn't discount the thing about the brother. Who are we going to believe, you here in the appeal of a Federal habeas off of a State case or the trial judge making the determination that he agrees? Because if he thought this guy was being very credible, the juror would have had a different outcome. So, I mean, to me, the idea that we would grant habeas because we disagree about whether a juror we never saw was telling the truth about something seems very far removed from my understanding of habeas law. What do we do with this whole record that doesn't have that development? I agree with you that what you would anticipate, as always, if you had three legs with that stool solid and you have a good defense lawyer and a prosecutor, that the defense counsel is going to quickly, the comparative analysis is really done as an adversarial contest between the defendant challenging the differential framing of questions. And it is both. But it has a lot to do with the actual question itself. It doesn't always sort on the basis that you didn't ask the black man that but you didn't ask the white man that. It's contextual. It's more than that. So we're stuck. We're here with a record. It just doesn't show us any of that. Now, what do we do with that? The first thing that we ask Judge Higginbotham is that you send it back for the record to be developed. But I understand the court is concerned about the delay issue, and I'm sympathetic to that concern, so you can grant relief on the basis of either the locket claim or the furlough claim, and I'll just spend my remaining time on those if it's all right with the court. What was this? I don't have the dates in my head, but this was all post-Batson? That's the trial? Oh, yes. It was post-Batson but not post-Millerell. The trial was not post-Millerell, correct, but the state habeas proceeding was post-Millerell. Post-Batson but not Millerell. Correct. But the state habeas proceeding was post-Millerell. But the trial? The trial was not. That's what I'm pointing to. The trial was not. I have a couple of points that I wanted to make about the locket claim. The first is that the proper definition of mitigating evidence is any evidence, any aspect of a defendant's character, background, history that might cause a juror to vote in favor of a life sentence rather than a death sentence. I believe that there are only two cases. I've spent a lot of time looking for cases where family photographs were excluded. And I've only found two cases. There may be a reason why that was done. Well, and probably they're never excluded, Judge. I think that's right. And I would say that there are only two cases that I have found where photos are excluded and the courts address whether they are mitigating within the meaning of locket. Well, most trial judges are savvy enough that it makes no difference to anybody and so go ahead. The case is Barnes v. State, which is a Georgia Supreme Court case from 1998, 496 S.E. 2nd, 674. The jump site is 687-90. And then there's a Third Circuit case called Marshall v. Hendricks, 307 F. 3rd, 36. The jump site is 112-114. It's a long opinion Third Circuit from 2002. If mitigating evidence is excluded, it's structural error. So do you need to send it back? No. If it was improper to exclude the mitigating evidence, it's structural error, and Mr. Rhodes is entitled to a new sentence. So let me ask you this. I mean, I agree with Judging and Botham. All three of us have been trial judges. I think we all would have let it in under the kind of why not principle that it, you know, it may be irrelevant, but there's no reason to keep something out like that in a death case. But that isn't a reason for us to grant habeas, obvious. And so my question is, how does that fit in the general notion of mitigation being that he had this terrible childhood to show him as this happy child, except just to inspire sympathy, because any time you see somebody as a child, they seem nicer than they might seem now? I think that's precisely what the purpose of the photograph is. But is that mitigation, or is that just pure appeal to sympathy? It's mitigation. It's humanizing the defendant. This is a defendant who was a habitual criminal, and the goal of the defense team is to humanize him. And when you see this kid with Little League trophies and sitting there with his friends on the street, there is a picture that is painted of him that is different from the picture that the prosecutor was painting of him as just this person who bounces around from one crime to the next. He's not human. The way prosecutors get death sentences is by dehumanizing the defendant. Well, and the reason given for not admitting it is that it was irrelevant. Was that the reason? Yes. And I certainly don't agree with that. For all the reasons you just gave, I think it is, in fact, relevant. And so if it's relevant, then the effect of it, once it comes in, that may be a matter for some debate whether or not it would have helped or hurt him. But to exclude it based on a finding that it's irrelevant is error. It's error, and we don't have to ask the harm question because the exclusion of mitigating evidence that should have been admitted is structural error. So would it have mattered? Tell me the case on that. There's a case from the Fourth Circuit called Bacon v. Lee, 225 F. 3rd, 480, Fourth Circuit, 2000. A case from the Eleventh Circuit called Antone v. Strickland, 706 F. 2nd, 1534. What was the mitigating evidence that was excluded in those cases? I don't remember, Judge Higginbotham. Okay. And so the double-edged sword nature isn't something we can look at because we sure do a lot. Yes, but that's only evidence that is double-edged. I don't think that fair to look at it. I mean, this is double-edged if your point is that this young man had a terrible upbringing, and then you show him having a normal childhood, then that is double-edged because it looks like, well, this kid had all the advantages. He got to be in Little League. He had a good life, and then he turned around and became this hardened criminal as opposed to he had a father who beat him and so on and so forth and some of the things that we hear about. And I'm not making light of that. I understand what you're saying, Judge Haynes. I think that the question that is raised by whether evidence is double-edged would not come up in this context. The defense lawyers wanted to put the evidence in. The question of whether evidence is double-edged comes up only when the defense lawyers make a tactical decision not to put on some evidence, and then a lawyer like me comes along later and says they should have put on that evidence because it would have been mitigating, and the trial lawyers say, no, the reason we didn't is because it was double-edged. In that context, yes. So it's only in the IAC, is it? Only in the IAC.  You've got to get to furlough. All right. I want to say just a couple of quick things about the furlough. The first is in finding of fact number 66, the State habeas court says that the affidavits of the trial counsel and the district attorney established that the objection was made. What the State habeas court says is in findings number 112 and 113, 112, on direct appeal of the applicant's conviction, the court of criminal appeals held that the application of a specific or timely objection waived his appellate complaints concerning the admission of Smithy's testimony. Finding 113, the court finds, that is the trial court finds, that on direct appeal of the applicant's conviction, the court of criminal appeals was bound by the parameters of the appellate record, which did not include the contents of the unrecorded portion of the bench conference when trial counsel objected to Smith's furlough testimony. And then in the conclusions of law, the State habeas court says based on trial counsel's objection to Roy Smith's testimony, and then goes on to articulate its findings. So the last and reasoned State habeas court opinion with respect to the furlough testimony is that the objection was preserved. Smithy's testimony was dramatically misleading when it was offered, and that raises a question under Simmons and Schaffer that say that when false or misleading aggravating evidence comes in, reversal is required. And subsequent to trial, the testimony became flatly false, and it's therefore just like Johnson v. Mississippi, where there is a salient piece of aggravating evidence that after the jury returns its verdict is revealed to be false. And in this case, after Smithy's testimony, that testimony was revealed to be false. Now, I just want to reiterate that the context here is that this is a guy who committed murder days after being paroled, and the most powerful aggravating evidence that the State could put on was that he might get out again, and that was false. Okay. You have reserved time for rebuttal. Thank you. We'll hear from Mr. Clendenin. May it please the Court. When the jury in Rhoades' case answered the special issues in his case, it was aware of several facts that are relevant to both of his first two claims. The jury had been presented a wide-ranging and comprehensive view of who Rhoades was. It knew all about his upbringing, his childhood, his time with his adoptive family, and it knew about how he grew into a vicious criminal. The jury also knew that, according to the State's prison witness, for whom the jury would see as the face of the Texas prison system— What did the pictures show? I'll tell you the pictures. What were they? I haven't seen the pictures, but what were they? There are about ten pictures of Rhoades that are in the record. Many are not very clear in the way they've been copied, but you can see one picture of him standing with a girl. It looks to be maybe a school dance, I assume. One of him holding a trophy. There's one of him holding a fish, like he's been fishing. One of him, I think, petting a sheep or something like that. And a couple others with him. I'm assuming it's him among a bunch of other different kids at a pier. I should point out that because of the way the pictures are proffered to the trial court, we don't know—I assume, based on trial counsel's proffer, that it is Rhoades in the pictures, but the pictures are not authenticated. No witness testified that that was Rhoades in those pictures or which child was Rhoades in those pictures. Well, that really doesn't—the only basis that I understand for excluding them was relevance. That's right. Not the location of it. You wouldn't get the relevance until you—I really don't think that takes you very far. The question in my mind is what was the other evidence of his childhood, et cetera, et cetera. They have a right to develop mitigation, and humanizing it is the critical part component of these capital cases. And pictures could be part of it, but what else is in there that you would point to where he was? What else did they get before the jury with regard to his childhood, et cetera, et cetera? In other words, the pictures depict this, but also were there other evidence of the same kinds of things or what? The jury was presented the testimony of Rhoades' birth mother, who had Rhoades from about—when he was born to about age four. Let me frame the question more clearly. You're confronting an argument of structural error. Now, you can respond to that saying whether it's not error or not, and it's the up or down kind of thing. Or you can respond to it that the evidence was admitted, and that, in other words, structural error would be triggered if you're not— may or may not be triggered if this is simply cumulative of other evidence before the jury does the same thing. What really—was he given an opportunity to fully develop his childhood, et cetera, et cetera, by receiving material and evidence? So I want context for this ruling with regard to pictures. What else happened? Yes, the defense presented a wide-ranging and comprehensive view of who Rhoades was. I should mention, though, that this claim is not subject to structural error analysis. I understand. We'll come back to that, but I want to know what else was in there. Go ahead and answer. So let's assume, arguendo, it is structural error to fail to admit relevant mitigating evidence. Then the question would be if it's merely cumulative, though. I mean, if he already put in, let's say, 100 pictures and we didn't let in the one picture, then that obviously wouldn't be structural error. Was there other evidence that would humanize him, his childhood, that the jury had to consider? That's the question. Right. The majority of the evidence about his childhood and upbringing was negative, describing the troubled upbringing that he experienced. His adoptive father, Ernest Rhoades, did testify to a couple of positive attributes of Rhoades. He testified that Rhoades was gung-ho into sports when he was a teenager, he was into track, and that he enjoyed fishing. I think arguably, assuming that the pictures portray what we assume they do, Rhoades holding a trophy, I guess we can assume that that is some kind of evidence that he did enjoy track and he enjoyed fishing. So there was a little bit of evidence about his good character. So the idea that he did some normal childhood things to humanize him was brought out from at least his adoptive father? Yes. Okay. Now, answer the question about ‑‑ I certainly agree that refusing to let a defendant put on a mitigating evidence case in its entirety would clearly be structural error. I don't know that it's as extreme as Mr. Dow says, so tell us your perspective on whether if we were to conclude, as Judge Graves suggested, that the trial court erred in concluding this was irrelevant, would that mean we have to grant habeas relief? And if not, why not? No, because the claim is subject to harmless error analysis, and the probative value of these pictures has to be evaluated in light of the evidence that was presented at trial. And in light of the thrust of the defense's case, the thrust of the case was to portray Rose's upbringing as troubled and to attribute his later troubles to that upbringing. So the thrust of the case was about his troubled upbringing with his birth family, his abusive alcoholic father, his mother's own criminal trouble, but it also focused on his adoptive parents' efforts to get him help. That included psychological treatment through a number of psychologists and therapists who were not able to treat Rose. And I think that was another thrust of the case, was that these problems that Rose had were innate, either biologically or due to his troubled upbringing with his birth family. The defense presented all that evidence, and the jury considered all of it. So the exclusion of these few pictures that are really without context or with any mitigating context that the trial counsel provided to the court, it cannot be said that had the jury been. . . So putting aside the issue of the lack of authentication as an evidentiary argument, you're also making the point that the lack of discussion of these pictures makes their meaning much less clear. You just put in a bunch of pictures and you have no context, and that doesn't help us. And no witness was asked, well, do you have any pictures of him with trophies? And, Your Honor, I offer this one. So that in context, the judge could rule perhaps differently than when you're just offering a big pile of goo. Right. The point about the authentication is to illustrate the fact that the trial court did not have any real mitigating value to attach to the pictures in assessing whether or not they were relevant. It's important to note how they did come up. The state had made a motion in limine during the state's case in punishment asking that the defense proffer the pictures outside the presence of the jury so that the prosecutor could see the pictures and make any objection that she might have. So after the testimony of Rode's birth mother, defense counsel made that proffer and simply handed the 10 or 11 pictures to the trial judge and said we would like to make these pictures as mitigating evidence to show Rode's background and his upbringing and him in different stages of his life and also to humanize him and to appeal to the jury's sympathy. And that's the entirety of the argument and evidence that the trial court had to consider whether or not the pictures were relevant. So are you saying the pictures would have just been admitted and handed to the jury as part of the other evidence in the case? No. He was not going to call any witness or have any witness testify about any of the photographs. You're certain about that? That wasn't the plan? No, that's not the case. Trial counsel did indicate he was going to proffer them to the jury through the testimony of Donna Rodes, the adoptive mother, but he did not. That would have given some context. It would have, but when he made the proffer, he did not proffer them through the testimony of Donna Rodes. Had he done so, one, it would have authenticated. Well, that's one way to make a proffer. The other way to make a proffer is for the lawyer to say this is what's going to happen. This is what I intend to do and this is why.  I thought you said that they did tell the trial court that I intend to bring these suits to a stepmother. That's exactly the medium in which we're going to come in. He intended to, but the trial court found, based on the proffer, that he did not see the relevance of the pictures at that time. Well, I understand that, but the question was whether he was just going to hand up the pictures or bring forth a witness to put them in contact. And the answer is they was going to put them in contact with the witnesses. But then he didn't try to. I mean, you know, we've all been trial judges. I have, too, not over a death penalty case, admittedly. But a lawyer proffers something, oh, that's irrelevant. And then he tries again when he actually has the witness on the stand. Unless a limit he was granted or the judge said you can't ever talk about these pictures again, it seems to me that that's you don't stop there. You get in with the adoptive mother and you say, you know, tell me about his fishing and then you say I have a picture and, Your Honor, maybe we approach because I'd like to offer this picture now. And now it's in context. I guess I'm just having trouble with the concept that just coming up with a bunch of pictures is the same thing as having given the context and then being declined. But either way, is it structural error, even if it's error? If it's the case that you look at this record, that you have evidence that's been put forward regarding all of these events and so forth, then what you're talking about is then a particular whether or not there are areas that's being asserted is the opportunity to present the mitigating evidence, mitigating case by that particular method of pictures. Well, trial counsel did present an extensive amount of mitigating evidence. There were a couple pieces. Well, in capital cases, most all these capital cases, I wouldn't say most of them, but a high percentage of these cases, it's nothing but a mitigation case. It's a slow plea on the offense. So all you're doing in the liability portion of it is cross-examining to develop with one eye toward mitigation. That's what the slow plea is. So it's all about mitigation. And that's what lawyers are being trained to do in trying capital cases, is developing the mitigation cases. And that's where cases are won and lost, humanizing the defendant. That's what it's all about. So it is enormously important in that phase of the trial that they be given that opportunity. Now, if our question is what fair opportunity, what were they able to do? If it's no more than we didn't get pictures to display what we otherwise put before them, that's one thing. But counsel opposite is arguing that this is a substantial take away from their opportunity to humanize them. This is the only area in which trial counsel is not able to present the evidence that he wished to present. I'm sorry? This is the only instance in which trial counsel is not able to present evidence about roads that he wished to present. See, he was not cut off from presenting any. What did he do else? What else did he do? He presented a testimony of his birth mother who testified about the troubled upbringing early on. What about the mother who was going to present the pictures? The adoptive mother testified about Roe's personality. His personality troubles, his psychological problems, the really poor state that he showed up to their house in. When he was adopted, he was malnourished and apparently would be injured easily. His bones were brittle apparently. He urinated and defecated in his closet and hoarded food in his bedroom because he was so malnourished. She testified about the psychological treatment that they obtained for Roe's to try to get him help once his attention deficit and hyperactivity started to manifest later in his childhood. They testified about the other efforts they had just to incorporate him into their family, which they did. And she also testified about how as he became older, an older teenager, he began running away from home and became more incorrigible and eventually ran away from home for good. And the testimony of his father tracked that for the most part, but he did add those two pieces of information like I mentioned about the fishing and Roe's enjoying sports, good character type of testimony. And the defense also presented testimony of Dr. Wendell Dickerson, a psychologist who testified about his evaluation of Roe's and his psychological problems and the source of those. So the defense presented a wide-ranging and, like I said, comprehensive view of who Roe's was. And the trial counsel was not cut off from presenting any evidence other than these few pictures. Let me ask you, what is your best case for the proposition that assuming arguendo that we were to conclude that the state trial judge should have let these pictures in, what is your best case that that doesn't mean habeas relief should be granted? The first point is that the claim would be subject to harmless error analysis. And I think two points. One, like I said— I mean best case precedent case, like a citation case, like cite us a case. He cited a Fourth Circuit case for his proposition that it's structural error, and I'm asking you to cite an opposing case, preferably a U.S. Supreme Court case or at least a Fifth Circuit case, something binding on it. You have that. Skipper v. South Carolina from the Supreme Court indicates that this claim is subject to harmless error analysis. And this court, it's on page 38 of our brief, gives Fifth Circuit precedent indicating that it is subject to harmless error analysis. And in conducting that analysis, I think there would be no harm here because I think it's important to note here, like was mentioned before, that these pictures do not reflect the negative aspects of his upbringing. And they don't reflect the childhood that was lost, I think as one might say, as a result of the abuse that he suffered because these pictures were taken after the abuse that he suffered. So the probative value of these pictures are really minimal in context when compared to all the evidence that the jury had about Rhodes. And for that reason, it would be harmless. But what if—because these pictures were when he was with his adoptive family. Right. And it showed that he was doing normal things and engaging in positive activity. Right. And so wouldn't that be likely to suggest to the jury that maybe if we send him to prison and put him in an environment that has some structure and some rules and that he might be okay in an environment like that? Couldn't the pictures show that? Conceivably, but I think the probative value of that of him as a child between the ages of 4 and 10 or 4 and 11, which I think the age range was— All I'm saying is we're here talking about what effect the pictures may have had on people making the sentencing decision, and I'm suggesting that it could have had an effect that would have led to a conclusion other than the death penalty. That's all I'm suggesting. Conceivably, I should point out also that Ernest Rhodes, the adoptive father, did testify that Rhodes behaved well and got along very well with his adoptive or stepbrothers and sisters. So the jury did know that he did behave well and perform well. How many years had transpired between the oldest of the pictures and the date of the trial? I mean the youngest of the pictures. What are the most recent pictures that he was the oldest in versus the time of trial? The oldest picture, there was a picture of him as an adult or more grown up than a child, I guess just to say. I say apparently because it's not on the record, but it was when he was in Longview, apparently for the last time before he was incarcerated for a burglary of a dairy queen. I think that was in 1986, and he would have been 22 years old at that point. But that was years after the bulk of these pictures. Most of the pictures are from the age of 4 to 10 or 11. So he was 28 when he was tried? 27 or so, going on 28. Okay. Well, we need to let you get, unless there's other questions about the pictures, we need to let you get to the Batson. Well, what is your answer to the notion that the failure to do a comparative analysis, period, means we should send it back to the district court? That's not the case because, as this court has held, that I believe it's Fields v. Thaler and Woodward v. Epps. If the district court does not do the analysis, this court is plenty competent to do so and can do so without remand. There are two, I think, basic issues in terms of the comparative analysis and what effect the lower courts not doing the analysis has on this court. One is under ADPA, whether the state court's failure to conduct that analysis renders the decision unreasonable. And the answer to that is no because the CCA's opinion on direct appeal predated Miller L., which set forth the comparative analysis concept. The second way Rhodes can show relief under ADPA is to show that the state court unreasonably applied or determined the facts in this case. And he still can show that under a comparative analysis, and that's under Reed v. Quarterman. And Reed also says that the federal court has to conduct the comparative analysis, even if trial and direct appeal predated Miller L. But this court can conduct the analysis de novo, essentially. Although I should say that the district court did have before it a comparative analysis, and in its opinion it recounted the arguments that Rhodes had presented and our position and then concluded that the argument was without merit, Rhodes' argument was without merit. So just because the district court did not explicitly, step by step, say which juror is it considered and how, doesn't mean that a district court didn't consider it and didn't reject the claim because its opinion indicates that it did. I called it a weak analysis of disparate questioning as to Holliday. Right. And Randall, he said there weren't other people like him that had, you know, said something to that effect. Is there — what weight do we put on the fact that at least the prosecutor and the judge seemed to find that Randall did lie about his brother's reason for — or knowing his brother's reason for being in prison? We don't know. I mean, I don't know Mr. Randall. I don't want to accuse him of lying in a voir dire, but that's essentially the finding here, isn't it? And what do we — what is the — how do we analyze that? The trial court's findings are entitled to a presumption of correctness on review. So that presumption would apply to the findings regarding the jurors that were struck and the reasons offered by the prosecutor. So that presumption would apply to the finding that — I think here the finding might be that the prosecutor's intuition was that Mr. Randall was not being trustworthy or straightforward about his brother's situation. And the trial judge also implicitly at least found that to be credible, the prosecutor's notion. And that's entitled to a presumption of correctness because the trial court and the prosecutor were, of course, in the room with the voir dire members and could make credibility determinants. And there were other jurors asked about their relatives being in prison, and none of them said they didn't know why they were there, right? That's right. Okay. And what about this issue of the sleeping? Assuming, arguendo, that we have to credit the state trial judge's finding that Ms. Holliday was sleeping, is there evidence that there was a juror who was also sleeping but was — a white juror who was also sleeping but was put on the jury? No. Nothing like that. There is an indication during the discussion about Ms. Holliday sleeping that there were other jurors sleeping during the panel voir dire. But the prosecutor said — he indicated there was another juror who was apparently snoring or sleeping much more obviously than Ms. Holliday. But the prosecutor also said that he wouldn't want that juror on the case either, so presumably the juror was not ultimately on the jury. So there's no other juror that, one, no juror ultimately said who was sleeping during voir dire. But there's also — Did the judge find that Holliday was sleeping? Yes, he did. He specifically found that. The main reason, though, that the prosecutor gave for striking Ms. Holliday was her prior jury service during which she said the jury set him free, and that was a prior burglary case. And that's a reason that would give any prosecutor pause to have that person sit on the jury. And not only that, it's a reason that this Court has found to be sufficiently race neutral, and it's a reason that the Supreme Court in Davis v. Ayala indicated is race neutral. Was there any other juror who gave a similar answer to such a question? Yes. There was James Gaffney, who served on a prior criminal jury, who described the prosecutor's tactics in that case as annoying. Apparently the prosecutor would not elicit evidence that the defense would. He thought the prosecutor was annoying. And also Charles Drury was a not guilty vote on a hung jury on a prior criminal jury. And what happened to them? They were both struck. Okay. By the prosecution? Yes. Okay. And also— And do we know their race? Presumably they're—well, I say we know that they're white because the prosecutor said that they were. Okay. Another reason the prosecutor gave to strike Ms. Holliday was her own work experience with underprivileged children and her daughter's experience, work experience, indicating an interest in rehabilitation. And the prosecutor struck, I believe, three white jurors, James Gaffney, Robert Jordan, and Janet Bruckler, who either themselves had similar work experience or whose wife had similar work experience. So we have white jurors who were struck whose answers closely tracked Ms. Holliday's reasons or her answers, and those other jurors were struck. With regard to Mr. Randall, I should point out that not only did no other juror indicate or give the prosecutor reason to believe that they weren't being truthful about a relative in jail or in prison, no other panel member had a relative who was currently in prison. And that was one reason the prosecutor was concerned about Mr. Randall. Well, it seemed to me with Randall, he was equivocating a lot on his feelings about the death penalty. And in my experience, again, I don't have any experience with trying capital cases as a lawyer or a judge, but in my experience for Dyer in general, when you feel like somebody is equivocating with you, you want them to admit to something that will get them struck for cause so you don't have to use a peremptory. Is that a possible, and I'm not saying it applies to Randall, but is that a possible explanation for why you might question somebody more than someone else? If you feel like they're equivocating, you're trying to get them to say, I can't be fair, and then you get the cause strike without having to go use your peremptory? Sure. That's a valid point. Mr. Randall did give the prosecutor reason to think that he would not answer the future dangerousness special issue yes without a prior violent history, and that was one of the main reasons that he struck Mr. Randall. I should point out also that Mr. Randall gave one answer that really tracks closely to another struck a white juror who was struck, and that is that Mr. Randall said that if a capital murderer's prior history was not violent and he only had, say, an offense that involved stealing, he would not find a future danger. Fran Holden gave the same answer. She said that if a capital defendant did not have a prior violent history and whose prior history only included stealing donuts is the example that she gave, that she would not find the defendant to be a future danger. So those two answers track almost identically. And that was the principal reason why Mr. Randall was struck. But even beyond that, the prosecutor's intuitive belief that Mr. Randall was equivocating on the future dangerousness special issue alone would give him reason to strike Mr. Randall because he might fear that he would not be a reliable vote on future dangerousness. So the reasons the prosecutor gave were race neutral, and he did not treat any or she did not treat any other seated juror differently or any other struck juror differently. And as far as the questioning goes in particular, the reasons that Rhodes gave in the court below to show disparate questioning were that the prosecutor did not ask any other jurors, any other white jurors about their family's views on the death penalty or their friends' views on the death penalty or their religious views. He asked, I think, nine of the 12 jurors about those topics and a number of the struck white jurors. So there's no disparate questioning. A holistic reading of the transcript shows that the prosecutor had basically a script to go through, and that script often included those questions about their family and friends' views of the death penalty. And those questions were posed to both white and black jurors. All right. Tell us about the furlough. Even assuming arguendo that there was some possibility of a furlough for a life-sentenced capital defendant, there's no showing anybody ever got that furlough. And so why put that evidence on at all? And should we even, I mean, should we allow that to have happened because that could make the jury afraid that this guy might be out in the public someday and that might have led them to the death sentence? You know, this comes into these cases, and it's not an accident. There is no excuse for the state playing games with regard to the furlough. The law is clear, and the lawyers and prosecutors persist in this, and they do it for a very good reason. It's deadly stuff. I mean, the jurors here are asked questions like questions you would ask if you were asked to make that decision. You know, are we really the final decision-maker here? Am I at risk of putting this guy back on the street and just kill two people right after he got out of furlough? Now, that is really throwing acid in their face. It's tough, and I don't understand. The cross-examination here was very effective, and perhaps that takes care of it. But I want to be—the message needs to keep going out there and eventually get down to the judges who really try these cases, and more importantly to the prosecutors that you're not winning cases by playing that game because it is a game, and they know what they're doing. It doesn't just creep in by accident. It shouldn't happen. It's extraordinarily unfair, and it's unnecessary, too. But that's the other thing. I mean, you've got a defendant that's killed two people and so on and so forth. If you can't make your case about that, then you don't need this. The word unnecessary is the exact word that I thought of, unnecessary, but I also thought it was poorly planned out, and that's based on the prosecutor's explanation during their hearing on the motion for new trial. It was apparently a spur-of-the-moment thing that she asked of Roy Smithey. Had it been more thought out, it could have been presented to the jury regarding the procedures of furlough and the likelihood of a capital murder being released on a furlough. I mean, the thrust of Smithey's testimony was kind of what Justice O'Connor had alluded to, which is just because you're in prison doesn't mean the world is safe from you because there are prisoners in prison, and they might not, and guards and random people that come in for whatever reason. And so if he's violent in prison, he could hurt people in prison, and that seemed to be Smithey's basic thrust. But then, as Judge Higginbotham aptly noted, he went off on this furlough track, and the question is, is that habeasable error? That's a coin of phrase. Well, it's our view that it's not, and for a couple of reasons. I should point out first, I think it's important to note that the Rhodes had a prior history of escape. He escaped from juvenile detention when he was 22 years old because he gave a fake name and birthdate to the police. So he had a demonstrated willingness and ability to escape from custody, which I think is quite aggravating. But here, to show relief or an entitlement to relief, he has to show either that Smithey's testimony was false or misleading, which it wasn't, because all he testified to was that a capital murderer would be eligible for release and that he was not aware of any, not in just his seven years of experience, but in his knowledge, he was not aware of any capital murderer who had been furloughed. That testimony was true and accurate, and under California v. Ramos, the state court's denial of the claim could not be unreasonable, because as I mentioned in the brief. But wasn't the policy that no convict in a situation like this was going to get a furlough? Wasn't that a fact? Nobody was going to get eligible or not. They were not going to get one. That was the de facto policy. Is that right? Never been done. Never been done, but I think the jury can infer that from Smithey's testimony. But the only evidence that they would not even be considered despite eligibility comes in the form of double hearsay in the affidavit of Rosie Fronkowitz, which I don't believe is competent evidence to demonstrate that fact because it is double hearsay. Which the judge excluded or refused to consider for that reason, right? During the habeas proceedings? I think during the new trial. I think it was the new trial motion. That was the directive that was in place at Roe's trial, but the judge did ultimately consider the directive. Now, there was the affidavit that quoted these two people. I thought that was in the motion for new trial. No, that was during the state habeas proceedings later on. Okay. Either way, the judge refused to consider it because it was double hearsay. The state habeas court I don't think made any findings on that. I think the findings do discuss the fact that it was hearsay. I'm sorry. They did find that the evidence under this Court's Hogue v. Johnson case, that the hearsay evidence was not competent to demonstrate. Right. Smithee's testimony rendered the sentencing decision unreliable. So we don't know the answer to that question. Whether or not an inmate with this conviction could ever be furloughed. We don't know the answer to that question. We know what Smithee told us, and that's that he was aware of no inmate, capital murderer, sentenced to life who had been released on furlough. That is before the Court, and that's what the jury knew as well. The evidence from Rosie Franklin's affidavit is simply not before the Court in a competent manner. So there's no evidence that— No, you're telling me it's not before the Court. I'm telling you the answer to that question is an unknown. No one knows the answer. Jeremy Ginty in his hearsay statement says what he knows or what he believes, but that doesn't mean that that's true. It doesn't mean that the rest of the classification committee would agree with him. And it doesn't establish the fact that— And it doesn't mean they disagree with him. It doesn't mean that either. But it doesn't change the fact that Smithee's testimony was true, that he would be technically eligible for release on furlough. And like the defense counsel said in closing, even though he was eligible to be president of the United States, he would never become president. And for the same reason, the jury shouldn't believe that just because Rhodes was eligible for release on furlough that he ever would be. Okay. I see a lot of time. Yes. Thank you. Thank you. All right. Mr. Dow, we'll hear your vote. To touch on a point that both Judge Haynes and Judge Graves were addressing at the end of Mr. Clendenin's argument, we do know the answer. And the answer is that at the time of the trial, there had never been anybody in Rhodes' position who had been released on an unaccompanied furlough. We also know, based on the affidavits that, as Judge Haynes was referring to correctly, were actually attempted to be admitted during the hearing on the motion for new trial, there were documents that established that somebody who had Rhodes' conviction would not even have been eligible. So there was evidence offered during the hearing on the motion for new trial that suggested that Rhodes would not have even been subject to consideration. And what we know is, regardless of whether he would have been subject to consideration, there was never anybody in his position who had been released. Okay. I'm sorry. And I just wanted to clarify the number 74, the state habeas findings, is that Frankowitz's, which I guess is this rosy affidavit, are not substantive evidence because it's hearsay. So it was in the state habeas. But there was also a new trial issue. So I'm sorry. I got the two switched in my head. But nonetheless, the point that someone said that they were improper hearsay was, in fact, done. And wouldn't we — I mean, we're not going to find, as a matter of Federal law, that this application of state hearsay law was wrong. No, of course not. The regulations — And so then we wouldn't consider that. The regulations are part of the record in this case. Now, I'm talking about the regulations. The issue of whether anybody got it and the double hearsay and all of that, we wouldn't consider that then. We're not asking for this. Okay. We wouldn't consider that. Moreover, the reason that we are certain that we know the answer to the question that Judge Graves posed is because during state habeas proceedings, as I mentioned earlier, Roe Wilson submitted to the court the new regulations that say what Smithee said at trial was false. This cannot — But they were new. They were new. They weren't extant when Smithee gave the testimony. That is correct. That is correct. So Smithee wasn't getting up and lying about a present event. That is correct. It was later that these regulations were passed, and you're saying, therefore, that we should treat that retroactively in some way. What I'm saying is that under Johnson against Mississippi, when the core aggravating evidence, which is this is a guy who, if you let him out of prison, he's going to kill somebody because that's what he did this time, under Johnson against Mississippi, when that becomes false, when that aggravator becomes false, then the sentence is invalid. So there are two distinct claims. One is that it was misleading at the time it was offered. That's the Simmons claim. And the second is that subsequent to the jury's verdict, it became false, and that's the Johnson against Mississippi. But the becoming false when I have a criminal conviction that was wrongly obtained and now I don't have that criminal conviction anymore is, to me, a little bit different from a regulation that changes. Because otherwise your point would be, really, let's say he was convicted, given the death, under a proper statement that under the regulations he could get a furlough, and everybody agreed that was true. And then ten years later they said, we're not going to do that anymore. Then, whoops, now we can go back and undo that death sentence. That would seem inconsistent with my understanding, anyway, of how this works. So that would be different from if you're convicted of a predicate offense that was necessary to get you where you are, and then that predicate offense goes away because it was improperly obtained or invalid. I think that's just a very different thing qualitatively than a regulation that changes that has nothing to do with you personally. I think, Judge Haynes, that I would quibble and more than quibble with your characterization of Johnson. It was not a – what went away was not what made Johnson eligible for the death penalty. What went away was the core piece of aggravating evidence. No, no, I'm not saying in Johnson it was a predicate offense. I'm simply saying that the notion of somebody's prior criminal conviction being vacated is a separate kind of thing than a regulation changing, which regulations change all the time, that applies to a general prison population. I think those are very different things. That's all I'm saying. I agree. And I would say that the question is, what is the regulation that changed? And in this case, Rhodes is a guy who was convicted of a double murder a few days after he was released from prison. And the government argued that he would be eligible for release from prison. And any rational juror is going to say, holy smokes, this guy killed two people days after being released. We really need to make sure that he's not released. And since we just learned from this expert that he might be released if we sentence him to life, we've got to execute him. Okay. I want to be sure, because your client has been sentenced to death, that if there was anything you didn't get to say, because we asked you so many questions, that you go ahead and say it, because I think it's a very, very – I certainly do not mean to imply in terms of talking about the delay that we're in any hurry. We will take this and decide it carefully and with due consideration. Absolutely. So please, if there's something you want to say, go ahead. I just want to say one more thing, which is that you asked Judge Haynes, Mr. Clendenin, for his best case on whether Lockett error is subject to harm analysis, and he referred to Skipper against South Carolina. I encourage the Court to look closely at pages 4 through 8 of Skipper, because they do not support the characterization that you're going to subject Lockett. You might also look at footnote 12 in Lockhart, which qualified that otherwise overarching case there. I appreciate it. I'll accept that friendly amendment. All right. One thing I want to say. That's why he doesn't need access to computer research, because he just has memorized all the cases. One thing I do want to say, one, I appreciate the quality of the argument here. And, Professor Dow, I want to thank you, too, for taking on these cases. You do a wonderful job with them. It is tough work, and I congratulate you as a member of the Bar for taking on this task. Very important to do that. And we get quality representation. The cases are difficult, and we can't do them without lawyers like you guys coming to help. I deeply appreciate it. Thank you, Judge. I certainly appreciate both lawyers, and thank you for being here. And this matter is adjourned, and we will take it under submission.